GOLD & STOCK TEL. CO. (COLGATE v.).
See Cases Nos. 2,991 and 2,992.

GOLDBACK (UNITED STATES v.). See Case No. 15,222.

GOLDBERG (UNITED STATES v.). See Case No. 15,223.

GOLDEN (FULTON v.). See Case No. 5,155.

---

## Case No. 5,509.

### GOLDEN v. PRINCE.

[3 Wash. C. C. 313;[1] 5 Hall, Law J. 502]

Circuit Court, D. Pennsylvania. April Term, 1814.

BANKRUPTCY—DISCHARGE UNDER STATE LAW—STATE LAWS IN FEDERAL COURTS—RULES OF PRACTICE—LAW OF PLACE WHERE CONTRACT IS MADE OR DISCHARGED—COMITY OF NATIONS—CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS.

1. Action on a bill of exchange, drawn 10th of May, 1811, by the plaintiff, at St. Barts, on himself in Philadelphia, and by him accepted, and afterwards regularly protested for non-payment. The defendant claimed to be discharged from this debt, by a law of the state of Pennsylvania, passed 13th of March, 1812 [Laws Pa. 1812, p. 114], under which he had received a certificate, having conformed to the provisions of the law, and which law declares, that the certificate shall discharge such insolvent from all debts and demands due from him, or for which he was liable at the date of such certificate; and also, from all contracts originating before the said date, though payable afterwards.

[Cited in Woodhull v. Wagner, Case No. 17,975.]

2. The laws of the several states, constitutionally passed since 1789, are binding on the courts of the United States, held within the state in which the same prevail.

[Cited in Gill v. Jacobs, Case No. 5,426; Raymond v. Danbury & N. R. Co., Id. 11,593.]

[Cited in Re Stephens, 4 Gray, 560; Dunne v. People, 94 Ill. 129.]

3. Aliter, as to rules of practice. Every court possesses the power of making its own rules of practice, unless forbidden by law; and the 17th section of the judiciary law [1 Stat. 83], vests, expressly, this power in the courts of the United States.

[Cited in The Unadilla, Case No. 14,332.]

[Cited in Edwards v. Pope, 3 Scam. 470; The Aurora Borealis v. Dobbie, 17 Ohio, 128; Barry v. Iseman, 14 Rich. Law, 129; Sheppard v. Steele, 43 N. Y. 52.]

4. By the comity of nations, the laws of a foreign country where a contract is made or discharged, is considered by the tribunals of other nations, as the law of that contract, and they will decide according to such laws.

5. The bill of exchange upon which this suit was brought, being payable in Philadelphia, had a view to the laws of Pennsylvania.

6. A law which authorizes the discharge of a contract, by the payment of a smaller sum, or at a different time, or in a different manner than the parties have agreed, impairs its obligations, by substituting for the contract of the parties a legislative contract, to which they never assented. Such is the law of Pennsylvania

of 13th of March, 1812, and as such, it is unconstitutional and void.

[Cited in Blanchard v. Russell, 13 Mass. 14; State v. Amery, 12 R. I. 66.]

7. It seems to be a safe rule, that where an unqualified power is granted to the general government to do a particular act, the exercise of which, by the state governments, would be inconsistent with the express grant, the whole of the power is granted, and consequently, vests, exclusively, in the general government. The state governments cannot, in that case, exercise it, without showing an express grant; or that it is fairly deducible from the circumstance in which or where the claim is founded.

[Cited in People v. Wilson, 15 Ill. 392; Lafayette, M. & B. R. Co. v. Geiger, 34 Ind. 198.]

8. The exercise of the power by the state governments, to pass bankrupt and naturalization laws, is incompatible with the grant of a power to congress, to pass uniform laws upon the same subjects.

[Cited in Passenger Cases, 7 How. (48 U. S.) 556; U. S. v. Rhodes, Case No. 16,151; Citizens' Savings & Loan Ass'n v. Topeka, 20 Wall. (87 U. S.) 669.]

9. The omission of congress to pass a bankrupt law, does not authorize the several states to pass such laws; but the omission of that body to pass such a law, is, in effect, a declaration that there ought not to be such a law.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867.]

10. The law of Pennsylvania of 13th of March, 1812, is unconstitutional, because it impairs the obligation of a contract; and because congress have exclusively the power to pass a bankrupt law.

[Cited in Ogden v. Saunders, 12 Wheat. (25 U. S.) 295; Ashley v. Board of Supervisors, 8 C. C. A. 455, 60 Fed. 61.]

[Cited in Sheppard v. Steele, 43 N. Y. 57.]

In equity.

WASHINGTON, Circuit Justice. This is an action brought upon a bill of exchange drawn by the defendant, on the 10th of May, 1811, at St. Barts, for value received there, in favour of the plaintiff, on himself, at Philadelphia, 90 days after sight, which was regularly noted for non-acceptance, and protested for non-payment. This action was brought on the 4th of May, 1812; to which the defendant pleaded in bar, his discharge, under a law of this state, passed on the 13th of March, 1812, for the relief of insolvent debtors; obtained provisionally on the 23d of April, and finally, on the 29th of May, 1812. The case agreed, states, that the defendant did not give to the plaintiff, or to any agent of his, notice of the defendant's petition, which was presented on the 20th of April, 1812, although the plaintiff's attorney was informed of the application a few days after it was made; nor has the plaintiff proved his debt under the said proceedings. The act referred to in the plea declares, that a debtor who has conformed to the several regulations of the law, for the purpose of vesting all his property in the assignees, for the benefit of his creditors, and who has received his certificate of discharge from the commissioners, shall be set at large by the

---

1 [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

sheriff, if he be imprisoned; and that such certificate shall be conclusive evidence of the fact, that such petitioner has been discharged by virtue of that act; and shall be construed to discharge such insolvent from all debts and demands due from him, or for which he was liable, at the date of such certificate, or contract, or originating before that time, though payable afterwards. It is objected to this plea—1. That the act under which the discharge is claimed, having been passed since the year 1789, affords no binding rule for the government of this court:—2. That the law is unconstitutional and void in two respects; as being a bankrupt law—and as being a law impairing the obligation of contracts.

The ground of the 1st objection is, that the 34th section of the judicial act of congress, passed on the 24th September, 1789 [1 Stat. 92], which declares, "that the laws of the several states, except where the constitution, treaties, or statutes, of the United States, shall otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply," extends only to such laws of the several states, as were in force at the time this law was passed. Admitting this position to be correct, it would not follow, that this law would not, on that account, have a binding force, or furnish a rule of decision in this case. The laws even of foreign countries where a contract is made, are by the comity of nations regarded every where as a rule of decision, in relation to that contract; and it would be strange if the laws of one state, in which a contract was made, should be disregarded in any other state of the Union as a rule of decision. In like manner, the laws of a country, which operate to discharge a contract made in the same country, are regarded and enforced by foreign courts. This doctrine was fully examined in this court, in the case of Camfranque v. Brunell [Case No. 2,342], upon a question of bail. Independent, therefore, of the act of congress, if a contract made in this state, or with a view to its laws, be discharged under a law of this state, against which no constitutional objection can be made; such laws would be regarded as rules of decision by this court, as well that which discharged the obligation, as that under which it was created.

It was denied by the counsel for the plaintiff, that the contract in this case had a view in its execution to the laws of Pennsylvania; but nothing can be more clear, than that the bill in question amounted to a promise, made by the defendant, to pay the sum mentioned in it, in the city of Philadelphia, ninety days after sight. Payment could have been demanded no where but in Philadelphia, in order to enable the plaintiff to recover. The bill in this case, is precisely like that in the case of Robinson v. Bland, 2 Burrows, 1077; and is consequently within the principles laid down in that case. These principles would be sufficient for the decision of this part of the case, without resorting to the act of congress, which has been mentioned; but, as other cases may occur, where the general rule admitted by the comity of nations, may not entirely apply; and, as there appears to us to be no difficulty in giving a construction to the 34th section of this act; it may not be improper to take this opportunity of doing it.

It is to be remarked, in the first place, that the words of this section are general, so as to include, as well the laws of the respective states, which might thereafter be passed, as those which were then in existence. The reason for construing this section prospectively, as well as in reference to the time when this law was enacted, is equally strong. The powers bestowed by the constitution upon the government of the United States, were limited in their extent, and were not intended, nor can they be construed to interfere with other powers, before vested in the state governments; which were, of course, reserved to those governments impliedly, as well as by an express provision of the constitution. The state governments, therefore, retained the right to make such laws as they might think proper, within the ordinary functions of legislation, if not inconsistent with the powers vested exclusively in the government of the United States, and not forbidden by some article of the constitution of the United States, or of the state; and such laws were obligatory upon all the citizens of that state, as well as others who might claim rights or redress for injuries, under those laws, or in the courts of that state. The establishment of federal courts, and the jurisdiction granted to them in certain specified cases, could not, consistently with the spirit and provisions of the constitution, impair any of the obligations thus imposed by the laws of the state; by setting up in those courts a rule of decision, at variance with that which was binding upon the citizens, if the suit had been instituted in the state court. Thus, the laws of a state affecting contracts, regulating the disposition and transmission of property, real or personal, and a variety of others, which, in themselves, are free from all constitutional objections; are equally valid and obligatory within the state, since the adoption of the constitution of the United States, as they were before. They provide rules of civil conduct for every individual who is subject to their power, in all their relations to society; and consequently cannot, in cases where they apply, cease to be rules by which the conduct of those individuals is to be decided, when brought under judicial examination, whether the decision is to be made in a federal or state court. The injustice, as well as the absurdity of the former deciding by one rule, and

the latter by another, would be too monstrous to find a place in any system of government. Thus, for example, if the laws of a state, which regulated the distribution or transmission of property in the year 1789, should be totally varied by a subsequent law, the latter only would be the rule by which property could be distributed or transmitted from the time the law came into operation; and it can never be seriously contended, that a person interested in this property, and from the adventitious circumstance of his residence in another state, entitled to make his claim, either in the federal or state court, should recover more by resorting to the former, than he would have recovered had he applied to the latter court. With respect to rules of practice for transacting the business of the courts, a different principle prevails. These rules are the laws of the court, and are, in relation to the federal courts, laws arising under the constitution of the United States, and consequently not subject to state regulations. It is in reference to this principle, that the 17th section of the same judicial act authorizes the courts of the United States to make all necessary rules for the orderly conducting business in the said courts, provided the same are not repugnant to the laws of the United States; and under this power, the different circuit courts, at their first sessions, adopted the state practice as it then existed, which continues to this day, we believe, in all the states, except so far as the courts have thought proper, from time to time, to alter and amend it. Indeed, the counsel for the plaintiff, in this case, seemed to admit the distinction between general, laws affecting rights, and those which relate to the practice of the courts; but still he contended, that the act of assembly in question, afforded no rule of decision for this court, and could not be pleaded in bar of the action, because it was enacted since the year 1789. Now, it is most clear, that a law which discharges a contract, is no more a law of practice, than one, under the sanction of which, the contract was made. If it would bar the action in a state court, it would equally do so in a federal court; although the particular mode of setting up the bar, might depend upon the practice and rules imposed by the state laws upon the former courts, and those which the latter may have thought proper to adopt.

The next question is, whether the law relied upon by the defendant, to bar the present action, is repugnant to the constitution of the United States; and, on that account, is not to be regarded by the court, in this case? We shall reverse the order pursued by the counsel, and consider, in the first place, whether this law is repugnant to the constitution, upon the ground of its impairing the obligation of contracts? It may be proper to premise, that a law may be unconstitutional, and of course void, in rela-

tion to particular cases; and yet valid to all intents and purposes, in its application to other cases within the scope of its provisions, but varying from the other in particular circumstances. Thus, a law prospective in its operation, under which a contract afterwards made, may be avoided in a way different from that provided by the parties, would be clearly constitutional; because the stipulations of the parties, which are inconsistent with such a law, never had a legal existence, and of course could not be impaired by the law. But if the law act retrospectively, as to other contracts, so as to impair their obligation, the law is invalid; or, in milder terms, it affords no rule of decision in these latter cases.

The question then is, whether a law of a state, which declares that a debtor, by delivering up his estate for the benefit of his creditors, shall be for ever discharged from the payment of his debts, due or contracted before the passage of the law;—whether the creditor do any act, or not, in aid of the law; can be set up to bar the right of such creditor to recover his debt, either in a federal or state court? We feel no difficulty in saying that it cannot; because the law is, in its nature and operation, one which, in the case supposed, impairs the obligation of a contract. What is the obligation of a contract? It is to do, or not to do, a certain thing; and this may be either absolutely, or under some condition; immediately, or at some future time, or times; and at some specified place, or generally. A law, therefore, which authorizes the discharge of a contract, by a smaller sum, or at a different time, or in a different manner than the parties have stipulated, impairs its obligation, by substituting for the contract of the parties, one which they never entered into; and to the performance of which, they of course had never consented. The old contract is completely annulled, and a legislative contract imposed upon the parties in lieu of it. That a law which declares a subsisting contract to be void, impairs its obligation, will, we presume, be admitted by all men who can understand the force of the plainest terms; or, if not so, then we should be curious to know by what means the obligation of a contract can be impaired? And if this be the effect of such a law; in what respect does it differ from another, which declares, that a debt consisting of a specified sum, and due at an appointed period of time, shall be discharged at a more distant, or indeed at a different time, or with a smaller sum? The degree of injury to the creditor, may not be so great in the one case as in the other; but the principle is precisely the same. That the framers of the constitution were extremely jealous of the exercise of such a power by the state governments, is apparent from other parts of the section, in which the provision we are examining is found. It would have been a vain thing, to prohibit the state

legislatures from passing laws, by which a contract might be annulled, or discharged, by payment of a less sum than is stipulated, if they could emit bills of credit, and make them, or any thing but gold and silver coin, a tender in payment of debts; and, therefore, they are expressly forbid to pass any such laws. And yet, a law, which should make a depreciated paper currency a tender in payment of debts, might be less injurious to the creditor, than one which discharges the debt altogether, upon the payment of perhaps a shilling in the pound, or any other sum less than that stipulated to be paid.

The opinion given upon this last point decides the cause in favour of the plaintiff; and we might well spare ourselves the trouble of examining the other objection made by the plaintiff's counsel to the validity of this law. But, when we observe, from the case under consideration, that a power to pass bankrupt laws is deemed by one state, at least, to be rightfully vested in the state legislature; (for otherwise we must suppose it would not have been exercised;) and when we recollect, that the constitution of the United States contains a grant of other powers to the general government, which may equally with that immediately under consideration be exercised by the state legislatures, if such a right exist in either case; we hold it to be our duty to embrace the first opportunity which presents itself, to express the unhesitating opinion which we entertain upon these great questions, and thus to pave the way for as early a decision of them, as possible, by the supreme national court. No citizen feels a higher respect than we do for the state governments, or would be more cautious in questioning the validity of any laws which their legislatures might think proper to enact. But we should very unfaithfully discharge our duty, were we to remain silent witnesses of designed or unintentional usurpations, by these governments, of powers properly belonging to the general government; when a case comes judicially before us, which demands an expression of our opinion on these subjects. The sooner the limits which separate the two governments are marked by those authorities, which can alone define and establish them, the less danger there will be of serious, if not fatal collisions hereafter, arising respecting essential powers, to which a prescriptive right may be asserted by the one, in opposition to the chartered rights of the other. It is from these considerations that we venture respectfully, yet firmly, to examine the question, whether the power given to congress to pass uniform laws of bankruptcy, be exclusive of such power in the state governments; and whether the latter may exercise it whenever the former has not thought proper to do so.

It would seem, at the first view of this question, that, if an unqualified power be granted to a government to do a particular act, the whole of that power is disposed of, and not a part of it; consequently, that no power over the same subject remains with those who made the grant, either to exercise it themselves, or to part with it to any other government. But, if the application of this principle to the complicated systems of government which prevail in the United States, should be liable to doubt, it will, we presume, be admitted with this qualification; that whenever such a power is given to the general government, the exercise of which by the state governments would be inconsistent with the express grant, the whole of the power is granted, and, consequently, vests exclusively in the general government. In such a case, the people resume the power, which before resided in the state governments as to this subject, without which they could not grant the whole to the general government; and, if resumed, it would seem to follow, that the state governments can in no event exercise the same power, without showing either an express grant of it, or that it is fairly to be deduced from the circumstance upon which the claim is founded. That the exercise of the power to pass bankrupt and naturalization laws by the state governments, is incompatible with the grant of a power to congress to pass uniform laws on the same subjects, is obvious, from the consideration that the former would be dissimilar and frequently contradictory; whereas the systems are directed to be uniform, which can only be rendered so by the exclusive power in one body to form them.

It was admitted, in the argument of this cause, that whenever congress shall think proper to exercise the power granted to that body, to pass uniform laws of bankruptcy, the state governments cannot legislate upon the same subject. But it was contended, that, if congress shall decline to exercise the power, the right to pass such laws results to the state governments. This conclusion appears to us to beg the whole question in controversy. It resigns all claim to a concurrent right in the state governments, and sets up one which is to arise on a condition, not to be found in the constitution, but which is gratuitously interpolated into it. If, then, this claim of the state legislatures is not founded upon any express grant made to them in the constitution, is it to be deduced from the circumstance of a nonuser of the power by congress? This doctrine appears to us to be as extravagant as it is novel. It has no analogy, that we know of, in legal or political science. It must, in some way or other, be likened to the case of forfeiture, which could not, we conceive, answer the purpose; because, if the power of congress is, upon principles purely legal, divested by an omission to exercise a valid right, it would not of necessity result to the state governments, but would more naturally revert to the people. If the forfeiture be political, then this absurdity would follow, that

congress would possess a right to do, by omission, what it must be admitted they could not effect by any direct and positive act:—that is, to delegate to the state governments the power of legislation over a particular subject, of which the people had thought proper not only to deprive the state governments, but to vest exclusively in the national legislature. The inconvenience of dissimilar and discordant rules upon the subjects of bankruptcy and of naturalization, no doubt, suggested to the framers of the constitution, the remedy which that body adopted, of vesting the right to legislate in those cases in the general government; that some uniform system might prevail throughout the United States, if congress should think that any regulations upon those subjects ought at all to be made. Now, it would not only violate the express grant of these powers to congress, but the policy which led the convention to withdraw them from the state governments, if they should be construed to result by implication to the latter, on account of the omission of the former to exercise them.

But let us examine into the reasonableness of this pretension of the state legislatures, and see if the policy which induced the grant of these powers to congress be not effectually answered by the omission of congress to legislate on those subjects as much as if they had done so. Suppose the subject of a bankrupt law to be brought before congress, and the questions to be whether such a system be a wise one under any circumstances, or be at all suitable to the present state of the country; and that body should, in its wisdom, decide negatively on those questions, it would seem to follow, that no bankrupt law ought to exist in the United States, for the reasons which induced the rejection of any plan to establish such a system. In this case, what is congress to do, in order to give effect to this policy? The answer is plain,—reject the bill and do nothing. Then the law of the land would be, that no man is compelled, against his will, to deliver up his property to be distributed amongst his creditors; and, consequently, that he is at all times liable to the payment of his debts, unless discharged by some other legal means. Now, will it be said that the state legislatures, availing themselves of the refusal of congress to act upon this subject, can be at liberty to thwart the very policy which induced it; and pass laws upon the same subject, not only changing the state of the law as congress had constitutionally left it, but impugning the policy which led the convention to deprive the state legislatures of the power altogether, by imposing upon the country at large a variety of systems, instead of one uniform system? To argue, that to prevent such an absurd consequence, congress must legislate upon the subject, is to assert, that in the exercise of a power intended to promote the general good, congress must do some act,

which, in its wisdom, it believes will produce a public evil—do wrong that good may come of it—a doctrine, as pernicious in politics as it is wicked in morals. How would state laws upon this subject, and in the case supposed, differ, otherwise than in degree, from similar laws, passed inconsistent with such as congress might think proper to enact upon the same subject? In the one case, the policy and the law of congress might be opposed in part only by the state law. But in the other, the whole policy and law are defeated by inconsistent rules, upon a subject where congress supposed that it was unwise to establish even a uniform rule.[2]

The subject of naturalization, is strongly illustrative of the principles which this course of reasoning is intended to prove. The power to pass laws upon this subject, is found in the same section, and is expressed in words of the same import, with that respecting bankruptcies. Now, suppose congress, deliberating whether the naturalization of foreigners ought, upon any, or upon what terms, to be allowed;—that the deliberations of that body should result in the conviction, that the natural population of the country is most conducive to the public interest; and therefore, that no encouragement ought to be given to the migration of foreigners to the United States.—In what manner is this policy to be rendered effectual? Congress cannot, for the purpose of preventing the state legislatures from interfering in this business, pass a negative law, declaring that foreigners shall not be naturalized; because, if the constitution forbids the exercise of such a power, by the state legislatures, such a law would be worse than unnecessary; and if it does not forbid it, then it would be void. Nothing, then, would remain for that body, but, as in the former case, to do nothing. This, then, according to the argument on the part of the defendant, would be the signal to the state legislatures to commence their operations. Virginia, for example, is of opinion, that for the purpose of settling her extensive waste and uncultivated lands, the migration of foreigners to that state, ought to be encouraged by every means; and in order to favour this policy, she declares, that the residence of a year or a month, without any other restriction whatever, shall be sufficient to entitle all foreigners to the right of naturalization in that state. They are accordingly made citizens; and after the constitutional period, are chosen to represent the people of that state in the national legislature, and emigrating to the other states, with the constitution in their hands, they claim all the privileges of natural born citizens of those states.

The other states might well complain, that, although the people had declared their willingness to admit foreigners to the privileges

---

[2] The bankrupt law [of 1800 (2 Stat. 19)], passed by congress, and afterwards repealed, is a strong exemplification of these principles.

of natural born citizens, provided the regulations under which this admission is granted, were formed by the united wisdom of the representatives of all the states; yet they had never granted, or intended to grant, to one state, the right of legislation over the other states. They might contend, that the introduction of foreigners to the electoral franchise, and still more into the national legislature; was an experiment dangerous to the tranquility and the welfare of the nation;—that they might be tainted with principles unfriendly to our republican institutions, and with foreign attachments wholly incompatible with their duties as citizens and legislators,—that if admitted at all, they should not only abjure all allegiance to any foreign government, and, if of the order of nobility, should renounce all claim to the same; but that they ought to be men of good moral character, and attached to the constitution of the United States; and finally, that the grant of this privilege should be preceded by a probationary residence in the United States, for a length of time sufficient to afford the necessary proof of the reality of these qualifications in the applicant. To these complaints, what could reason oppose? Nothing;—she must be silent. And is this, then, a case where powers not expressly given by the constitution, are to be assumed by construction and implication? It certainly will not be contended, that the powers to pass bankrupt and naturalization laws, are, by the amendments to the constitution, reserved to the states in cases where they are not exercised by congress; because, this reservation is made only of such powers as are not granted to the general government; if granted, it would seem to follow, that they are not reserved to the states, or to the people. But it is not, in our opinion, correct to say, that congress, by refusing to pass laws on these subjects, has not exercised the powers confided to that body by the constitution, in relation thereto. The refusal amounts to a declaration of the public will, that such laws are unwise, and ought not to exist. And yet, upon the argument in favour of state pretensions, this monstrous doctrine must be maintained, that one or more states may pass laws, not only in opposition to the policy and the legislative will of the general government, but to the laws of the other states, enacted upon the same subjects, which, to a certain extent, they partially repeal. A doctrine leading to such absurd and dangerous consequences, ought to have something more solid to stand upon, than a constructive grant of power.

We are, upon the whole, of opinion, that the law under which the certificate is pleaded, in bar of the action, is altogether unconstitutional, for the reason last mentioned; and is so in reference to this debt, for the first reason. We desire that it may be distinctly understood, that we do not mean to give any opinion on the subject of insolvent laws, acts

of limitation, and the like, because they are not now before us; and sufficient to the day is the evil thereof. We have introduced the subject of laws of naturalization, because we find that subject to be, in all respects, precisely like that which is particularly involved in this cause. Judgment for plaintiff.

---

GOLDEN (RICHARDSON v.). See Case No. 11,782.

GOLDEN GATE, The (ASHBROOK v.). See Case No. 574.

GOLDEN GATE, The (HILL v.). See Cases Nos. 6,491 and 6,492.

GOLDEN GATE, The (McGUIRE v.). See Case No. 8,815.

GOLDEN ROSE, The (BOREAL v.). See Case No. 1,658.

GOLDEN STATE, The (RUDDY v.). See Case No. 12,111.