*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0038P (6th Cir.)
File Name: 03a0038p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: PAMELA L. HOOD,
                          *Debtor.*

_____

PAMELA L. HOOD,
                          *Appellee,*

         *v.*

TENNESSEE STUDENT
ASSISTANCE CORPORATION,
                          *Appellant.*

No. 01-5769

On Appeal from the Bankruptcy Appellate Panel
of the Sixth Circuit.
No. 99-22606—David S. Kennedy, Bankruptcy Judge.

Argued: September 20, 2002

Decided and Filed: February 3, 2003

Before: KENNEDY and MOORE, Circuit Judges; DOWD,*
District Judge.

_____

*The Honorable David D. Dowd, Jr., United States District Judge for
the Northern District of Ohio, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:** Marvin E. Clements, Jr., OFFICE OF THE ATTORNEY GENERAL, BANKRUPTCY & COLLECTION DIVISION, Nashville, Tennessee, for Appellant. Leonard H. Gerson, ANGEL & FRANKEL, New York, New York, for Appellee. **ON BRIEF:** Marvin E. Clements, Jr., OFFICE OF THE ATTORNEY GENERAL, BANKRUPTCY & COLLECTION DIVISION, Nashville, Tennessee, for Appellant. Leonard H. Gerson, ANGEL & FRANKEL, New York, New York, William A. Cohn, COHN LAW FIRM, Cordova, Tennessee, for Appellee. Elise W. Porter, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, Richard N. Coglianese, OFFICE OF THE ATTORNEY GENERAL, EMPLOYMENT LAW SECTION, Columbus, Ohio, Michelle T. Sutter, OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amicus Curiae.

MOORE, J., delivered the opinion of the court, in which DOWD, D. J., joined. KENNEDY, J. (pp. 20-22), delivered a separate concurring opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. The Tennessee Student Assistance Corporation ("TSAC") appeals from the Bankruptcy Appellate Panel's decision denying TSAC's motion to dismiss for lack of jurisdiction. After receiving a discharge in her Chapter 7 bankruptcy proceedings, plaintiff Pamela Hood filed for a hardship discharge from her student loans and named TSAC in the complaint. The bankruptcy court denied TSAC's motion to dismiss on the grounds of sovereign immunity, and the Bankruptcy Appellate Panel affirmed that decision. TSAC now appeals, arguing that the Constitution's Bankruptcy Clause, Art. I, sec. 8, does not give

have shared in those assets.  Having attempted to benefit from the powers of the federal bankruptcy court, it must, therefore, accept the court's power to decide whether the hardship exception protects Hood from the general student loan exemption. *See New York v. Irving Trust Co.*, 288 U.S. 329, 332  (1933) ("If a state desires to participate in the assets of a bankrupt, she must submit to the appropriate requirements by the controlling power.").

Although I agree with the majority that we should not normally reach issues not raised before the bankruptcy court, we have recognized certain exceptions to that rule.  In *Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F. 2d 1445, 1461 (6th Cir. 1988), we held that we may reach an issue if it "is presented with sufficient clarity and completeness" for the court to resolve the issue.  The Supreme Court has held that the decision to deviate from the general rule is a matter "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).  Moreover, the Supreme Court has long recognized that we should not decide constitutional questions when their resolution is unnecessary to the outcome of the case. *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972) (noting the "custom of avoiding decision of constitutional issues unnecessary to the decision of the case before us."). *See also Bejjani v. INS*, 271 F.3d 670, 687 (2002) (noting that "where possible, a court should rule on a narrow ground in order to avoid a constitutional question.")  While the issue of waiver was not raised in the bankruptcy court, the facts with respect to the filing of the claim are not in dispute, and the documents relied upon to establish those facts are from the bankruptcy court's records.  In this case, the waiver question is presented with sufficient clarity and completeness to resolve the issues before this court without having to reach the complex constitutional questions raised by the parties.

Congress the power to abrogate states' sovereign immunity in 11 U.S.C. § 106(a).  Applying the analysis that the Supreme Court set forth in *Seminole Tribe*, we conclude that Article I, section 8 of the Constitution gives Congress the power to abrogate states' sovereign immunity.  Accordingly, we **AFFIRM** and **REMAND**.

## I.  BACKGROUND

On June 4, 1999, Pamela Hood received a discharge on her no-asset Chapter 7 bankruptcy petition.  Because 11 U.S.C. § 523(a)(8) prohibits discharge of student debts held by governmental bodies except upon showing of "an undue hardship," on September 14 of that year Hood filed an adversary proceeding for a hardship discharge of her student loans. TSAC, whom Hood had named as a defendant, moved to dismiss the complaint on the grounds of sovereign immunity.  The Bankruptcy Court for the Western District of Tennessee denied the motion to dismiss, holding that Congress acted pursuant to a valid grant of constitutional authority when it abrogated the states' sovereign immunity in 11 U.S.C. § 106(a).

A unanimous Bankruptcy Appellate Panel affirmed and ruled that "as a part of the plan of the Constitutional Convention, the States ceded to Congress their sovereignty over bankruptcy discharge matters." *Hood v. Tennessee Student Assistance Corp.* (*In re Hood*), 262 B.R. 412, 413 (B.A.P. 6th Cir. 2001).  Although the panel acknowledged that *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), could be interpreted as precluding Congress from ever abrogating states' sovereign immunity under any of its Article I powers, the panel interpreted *The Federalist No. 81* and *No. 32* to distinguish bankruptcy, along with naturalization, from the rest of the Article I powers. *See Hood*, 262 B.R. at 417-419.  The panel noted that, with respect to bankruptcy and naturalization, the Constitution granted Congress the power to establish "*uniform* Laws," U.S. Const. Art. I, § 8, cl. 4 (emphasis added), not mere laws. *Hood*, 262 B.R. at 417.  According to the panel, *The Federalist No. 32* shows that

Congress's power to make uniform laws required states to surrender their own power to make such laws and thus an important degree of their sovereignty. *Id.* at 418-19. Because limits on sovereignty are by their very nature limits on sovereign immunity, the panel concluded that Congress's power to make laws on bankruptcy carries with it the power to abrogate states' sovereign immunity. *Id.* Congress clearly exercised that power in 11 U.S.C. § 106(a), which specifically abrogated the states' sovereign immunity with respect to actions under § 523.

TSAC timely appealed. We have jurisdiction under 28 U.S.C. § 158 and Federal Rule of Appellate Procedure 6. We review the decision of the bankruptcy court directly, reviewing its factual findings for clear error and its legal conclusions de novo. *Harker v. Troutman* (*In re Troutman Enters.*), 286 F.3d 359, 363 (6th Cir. 2002).

## II. ANALYSIS

Until 1976, a debtor could discharge his or her student loan debts in ordinary bankruptcy proceedings, whether or not the creditor was a state or state agency. If a state wished to assert an interest in a debtor's assets, the state had to file a claim, thereby waiving its sovereign immunity under *New York v. Irving Trust Co.*, 288 U.S. 329, 333 (1933). In the Education Amendments of 1976, however, Congress gave public entities that issued student loans a significant benefit: Congress prohibited the discharge of student loan debts in ordinary, non-adversary bankruptcy proceedings unless the loan had been in repayment for more than five years. For all loans that had been in repayment for less than five years, however, Congress prohibited discharge unless the debtor initiated a separate adversary proceeding and demonstrated that repaying the state would "impose an undue hardship." Education Amendments of 1976, Pub. L. No. 94-482, § 439A(a), 90 Stat. 2081, 2141 (1976) (codified at 20 U.S.C. § 1087-3 (1976)) (repealed in 1978 and replaced with current 11 U.S.C. § 523(a)(8)). Having received the benefit of a special adversary proceeding that makes it more difficult for debtors

invoked the federal bankruptcy court's jurisdiction and waived its sovereign immunity.

TSAC's second argument (in the alternative) is that filing a proof of claim only constitutes waiver of its immunity from jurisdiction over the normal bankruptcy adjudication, but not for an "undue hardship" proceeding under 11 U.S.C. § 523(a)(8). Although the Supreme Court's decision in *Gardner v. New Jersey* clearly holds that filing a proof of claim waives a state creditor's sovereign immunity with respect to normal discharge proceedings, TSAC argues that the adversarial proceeding required by federal bankruptcy regulations is separate and distinct from the normal bankruptcy discharge proceeding.

I disagree. The determination of "undue hardship" is inextricably interrelated with the normal discharge proceeding such that the waiver of sovereign immunity in one extends to the other. *See Rose v. United States Dep't of Educ. (In re Rose)*, 187 F.3d 926 (8th Cir. 1999) (state's submission of proof of claim waives its immunity in the "undue hardship" adjudication); *Burke v. State of Georgia Dep't of Revenue (In re Burke)*, 146 F.3d 1313 (11th Cir. 1998) (filing proof of claim waives immunity in adversarial action to enforce a bankruptcy court's stay order against a state because it is sufficiently related to discharge proceeding). As the Eight Circuit noted in *In re Rose*, "[t]he text of the bankruptcy code makes clear that these procedures are both part of a larger whole; the same section that exempts educational debt from a general discharge establishes the ground of undue hardship as the exception to the exemption." 187 F.3d at 930. The structure of the statutory provision reveals that "undue hardship" is a defense – indeed, the only defense – to the state's general privilege of exempting student loans from normal bankruptcy discharge proceedings.

Moreover, in filing a proof of claim, TSAC attempted to take advantage of the federal bankruptcy court's power to exempt student loans from general discharge proceedings. Further, if there had been assets in the estate, TSAC could

---

## CONCURRENCE

---

KENNEDY, Circuit Judge, concurring.    Because I conclude that TSAC has waived its sovereign immunity by filing a claim, I concur with the majority of the panel that the bankruptcy court has jurisdiction to hear this adversary proceeding.    I cannot join the panel's opinion and I thus concur in the judgment only.

It is well-established that when a state files a proof of claim in a bankruptcy adjudication, "it waives any immunity it otherwise might have had respecting the adjudication of the claim." *Gardner v. New Jersey*, 329 U.S. 565 (1947).

On November 15, 1999, an authorized agent of Sallie Mae Servicing Corporation, the original holder of Hood's student loan debt, signed an assignment of proof of claim form transferring the debt to TSAC.  The actual proof of claim was filed by Sallie Mae in the bankruptcy court on November 29, 1999.  The assignment of that proof of claim form was filed one month later, on December 20, 1999.  The assignment was effectuated with notice to TSAC and without objection from any party.  Although there is no claims docket or claims register in the record, that is only because it is standard practice in that district not to have a claims docket or claims register in a no-asset Chapter 7 bankruptcy and it does not change the fact that a proof of claim was filed.

TSAC's first argument it that it was Sallie Mae – not the state – who filed the proof of claim, and Sallie Mae does not have the authority to waive Tennessee's sovereign immunity. Although Sallie Mae filed the proof of claim, it was a proof of claim on a debt owned by TSAC. TSAC had voluntarily undertaken to guarantee Hood's student loans, and accepted assignment of the debt from Sallie Mae.  The assignment was made before the filing of the claim.    Under these circumstances, I think it is clear that TSAC voluntarily

to discharge their student loan debts, TSAC here seeks to exploit that benefit by asserting its sovereign immunity and preventing discharge altogether.  In other words, TSAC asks if it can have its cake and eat it, too.  We conclude that it cannot.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend XI.  This bar to federal jurisdiction also extends to suits against a state by its own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 10 (1890).  Thus private suits against states may proceed only if the state waives its sovereign immunity or if Congress, acting pursuant to a valid constitutional authority, abrogates the state's sovereign immunity.

### A.  Waiver of Sovereign Immunity

At oral argument, for the first time in these proceedings, Hood suggested that TSAC may have waived its sovereign immunity; in a subsequent letter brief to the court, Hood suggested that material not appearing in the Bankruptcy Court's docket sheet demonstrated that TSAC had in fact waived its sovereign immunity.  Specifically, Hood argues that TSAC's sovereign immunity was waived when Sallie Mae, the initial creditor for Hood's student loans, submitted a proof of claim in Hood's original, non-adversary discharge proceeding and assigned its proof of claim to TSAC.  Neither TSAC nor Sallie Mae took any further action on the claim in that proceeding, and the proof of claim was never entered on the court's docket sheet.

Hood waived this argument by failing to raise it before the Bankruptcy Court, the Bankruptcy Appellate Panel, or in her briefs before this court.  "'It is well-settled that this court will

not consider arguments raised for the first time on appeal unless our failure to consider the issue will result in a plain miscarriage of justice.'" *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (quoting *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 143 (6th Cir. 1997)). None of the circumstances that occasionally justify abandoning this usual rule are present here. As an initial matter, failing to consider Hood's waived argument hardly results in a plain miscarriage of justice; indeed, Judge Kennedy's consideration of the issue that was waived leads her to the same conclusion that we reach on the issue that was properly preserved. Nor do we believe that the issue "is presented with sufficient clarity and completeness" and that "its resolution will materially advance the progress of . . . already protracted litigation" such that it warrants special consideration under *Pinney Dock & Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1461 (6th Cir.), *cert. denied*, 488 U.S. 880 (1988). To the contrary, resolution of the waiver issue no more advances the progress of this litigation than does resolution of the abrogation issue, and resolution of the waiver issue requires reliance on extra-record evidence regarding the significance of an undocketed proof of claim that Sallie Mae filed *after* its officer had executed a document assigning its interest to TSAC. *See also Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986) (refusing to hear an argument first raised in a reply brief on appeal and noting that consideration of such arguments is inappropriate "when resolution of the issue is not obvious").

The concurring opinion would nonetheless have us rule on the waiver issue in order to avoid addressing the abrogation question. However, in an effort to avoid ruling on one constitutional question, Judge Kennedy is forced to address another: she rules that a state may waive its sovereign immunity simply by doing nothing. That is, the concurring opinion concludes that Sallie Mae waived Tennessee's sovereign immunity when Sallie Mae assigned a proof of claim to TSAC and the state failed to object. We take no position on whether Judge Kennedy is correct on this point, as the issue is a difficult one. *Compare Gardner v. New*

At the Constitutional Convention, the states granted Congress the power to abrogate their sovereign immunity under Article I, section 8. In 11 U.S.C. § 106(a), Congress used that power to grant states a benefit they had sought. We **AFFIRM** the denial of TSAC's motion to dismiss and **REMAND** to the bankruptcy court for further proceedings.

cure the previous systems' ills only if it applied uniformly to all creditors and debtors, the Bankruptcy Clause must grant Congress the power to abrogate the states' sovereign immunity.

### III.  CONCLUSION

Much of the evidence regarding the plan of the Convention is ambiguous.  However, the Supreme Court has made clear that the best evidence of the Framers' intentions on state sovereignty comes from the text of the Constitution and *The Federalist*.  *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 918-21 (1997).  Indeed, *Seminole Tribe* itself relies heavily on *The Federalist No. 81*.  *See Seminole Tribe*, 517 U.S. at 54, 69, 70 n.13.  Here, the Constitution's text and Hamilton's reference in *The Federalist No. 81* to the means of abrogating sovereignty in *The Federalist No. 32* suggest that, with the Bankruptcy Clause, the states granted Congress the power to abrogate state sovereign immunity.  The states' immunity was thus "altered by the plan of the Convention." *Alden*, 527 U.S. at 713.  Congress clearly exercised that power in 11 U.S.C. § 106(a).  Accordingly, TSAC is not immune from suit under 11 U.S.C. § 523(a)(8).

This conclusion in no way undermines the dignity of the state as a separate sovereign.  This is not an instance in which Congress has enabled private parties to "haul" states into court against their will, *see Federal Mar. Comm'n v. South Carolina State Ports Auth.*, __ U.S. __, 122 S. Ct. 1864, 1874 n.11 (2002), but an instance in which Congress has granted states precisely the protection that they sought.  Unlike a traditional lawsuit, in which a state is forced to defend itself against an accusation of wrongdoing, the bankruptcy process "is, shortly speaking, an adjudication of interests claimed in a *res*." *Gardner*, 329 U.S. at 574.  If the state wishes to assert its interest in the *res*, it may do so.  If it prefers not to, it may decline, and the debtor will still need to convince the bankruptcy court that repayment will constitute an "undue hardship." *See* 11 U.S.C. § 523(a).

---

*Jersey*, 329 U.S. 565, 573-74 (1947) (holding that when state voluntarily submits a claim in a bankruptcy proceeding, the state waives its sovereign immunity), *with College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 680 (1999) ("The whole point of requiring a 'clear declaration' *by the State* of its waiver is to be certain that the State in fact consents to suit.") (emphasis in original), *and Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (rejecting theory of constructive consent and finding waiver of state sovereign immunity only when state expressly waives it).  But given the choice between ruling on a constitutional question that was presented below and a constitutional question that was not, we will rule on the issue properly presented.  We decline to address the newly presented issue whether TSAC waived its sovereign immunity as a result of Sallie Mae's actions.

### B.  Abrogation of Sovereign Immunity

#### 1.  The *Seminole Tribe* Framework

The Supreme Court has addressed the question of valid abrogations of state sovereign immunity in a series of cases that began with *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996).  In *Seminole Tribe*, the Court ruled that the Indian Commerce Clause, which authorizes Congress to "regulate Commerce . . . with the Indian Tribes," U.S. Const., Art. I, § 8, cl. 3, does not grant Congress the power to abrogate state sovereign immunity.  *See Seminole Tribe*, 517 U.S. at 47.  The Court in *Seminole Tribe* first ruled that Congress had adequately expressed its intent to abrogate the states' immunity from suit.  *See id.* at 56.  In the second part of its inquiry, however, the Court ruled that in attempting to abrogate state sovereign immunity, Congress had exceeded its constitutional power.  Looking to *The Federalist* and other statements of the Framers, the Court determined that state sovereign immunity was an essential element of the Constitution's original structure.  *See id.* at 69-71.  Accordingly, the Court held that "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I

cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Id.* at 72-73. The Court applied a similar two-step, historical analysis in *Alden v. Maine*, 527 U.S. 706 (1999), wherein it extended *Seminole Tribe* to limit Congress's powers with respect to suits in state court as well.

Five circuit courts have concluded that under *Seminole Tribe*, Congress may not validly abrogate state sovereign immunity relying on its Bankruptcy Clause powers. *See Nelson v. La Crosse County Dist. Attorney* (*In re Nelson*), 301 F.3d 820, 832 (7th Cir. 2002); *Mitchell v. Franchise Tax Bd.* (*In re Mitchell*), 209 F.3d 1111, 1121 (9th Cir. 2000); *Sacred Heart Hosp. of Norristown v. Pennsylvania* (*In re Sacred Heart Hosp. of Norristown*), 133 F.3d 237, 243 (3d Cir. 1998); *Fernandez v. PNL Asset Mgmt. Co. LLC* (*In re Fernandez*), 123 F.3d 241, 243 (5th Cir.), *amended by* 130 F.3d 1138, 1139 (5th Cir. 1997); *Schlossberg v. Maryland* (*In re Creative Goldsmiths of Washington, D.C.*), 119 F.3d 1140, 1145-46 (4th Cir. 1997), *cert. denied*, 523 U.S. 1075 (1998). These circuits have relied primarily on *Seminole Tribe*'s broad language barring Congress from abrogating state sovereign immunity pursuant to its Article I powers. However, neither *Seminole Tribe* nor any of the Supreme Court's other recent sovereign immunity cases address Congress's Bankruptcy Clause powers as understood in the plan of the Convention. We engage in the *Seminole Tribe* analysis, and we conclude that the text of the Constitution and other evidence of the Framers' intent demonstrate that under the Bankruptcy Clause of Article I, section 8, Congress has the power to abrogate state sovereign immunity.

The *Seminole Tribe* inquiry must proceed in two parts. First, the Supreme Court requires that "to abrogate the States' Eleventh Amendment immunity from suit in federal court . . . Congress must make its intention 'unmistakably clear in the language of the statute.'" *Hoffman v. Connecticut Dep't of Income Maint.*, 492 U.S. 96, 101 (1989) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). There is no question here that Congress has done so. Section 106(a)

The *amici* states also cite the New York and Rhode Island conventions as conditioning ratification on an understanding that private persons could not sue the states. Like the ratification debates, the ratification resolutions are ambiguous on this front. Although both New York and Rhode Island expressed a preference that citizens never be allowed to sue states in federal court, the resolutions are ambiguous regarding whether they believed that the Constitution actually prohibited such suits. New York's resolution stated that its preference in favor of absolute sovereign immunity was "consistent with the said Constitution." 1 *Elliot's Debates* 329 (New York Resolution). Rhode Island, however, while expressing a preference in favor of absolute sovereign immunity, did so by calling for an amendment to make that preference law. *See id.* at 335-36 (Rhode Island Resolution). There would be no need for such an amendment if, as New York suggested, the Constitution were already clear on this point. Again, this evidence regarding the states' intent is ambiguous.

Those engaging in the state ratification debates were meticulous in raising their objections clause-by-clause, *see, e.g.*, 3 *Elliot's Debates* 543 (statement of Patrick Henry) ("No objection is made to [federal courts'] cognizance of disputes between citizens of the same state."), but none of the debaters objected to subjecting the states to federal suits in bankruptcy. This lack of recorded opposition puts suits in bankruptcy against the states in the same category with other constitutionally-approved limits on sovereign immunity, such as the provisions subjecting states to suit by the federal government, for example, or to suits between the states. *See, e.g.*, *United States v. Texas*, 143 U.S. 621, 639-40 (1892); 3 *Elliot's Debates* 549 (statement of Edmund Pendleton) ("The impossibility of calling a sovereign state before the jurisdiction of another sovereign state, shows the propriety and necessity of vesting this tribunal with the decision of controversies to which a state shall be a party."). So although the lack of expressed opposition could reflect a gap in an otherwise careful debate, it could also reflect the ratifiers' acceptance that because a federal bankruptcy system could

this third alienation of sovereignty, because the grant of a uniform power to the federal government is inconsistent with any retention of that power in the states; the same reasoning applies to bankruptcy. *See id.*

The question is whether Hamilton's identification of the uniform powers as examples of categories in which states have ceded sovereignty includes the ceding of immunity from suit. We conclude that *No. 32* does in fact refer to the ceding of sovereign immunity. Hamilton's cross-reference to this discussion in *No. 81*'s discussion of ceding sovereign immunity can only suggest that, in the minds of the Framers, ceding sovereignty by the methods described in *No. 32* implies ceding sovereign immunity as discussed in *No. 81*. There is no other explanation for his cross-reference in *No. 81*. Thus *The Federalist No. 81* and *No. 32* suggest that the states ceded their immunity by granting Congress the power to make uniform laws.

**5. The Ratification Debates**

Contrary to the *amici* states' suggestion, this interpretation is consistent with the ratification debates. First, although *amici* are correct that those debating the proposed Constitution's merits objected to certain suits against the states, *amici* point to no such objection specifically targeted against enforcing federal bankruptcy laws against the states. Rather, the bulk of the speakers objected to Article III, section 2, which allows suits between a state and citizens of another state. *See, e.g.*, 3 *Elliot's Debates* 533 (Jonathan Elliot ed., 2d ed. 1836) (statement of James Madison); *id.* at 543 (statement of Patrick Henry); *id.* at 555-56 (statement of John Marshall); *see also id.* at 527 (statement of George Mason) (objecting to federal jurisdiction over suits between state and foreign state, citizens, or subjects). Although the debaters' relative silence over sovereign immunity and the bankruptcy provision does not necessarily indicate their acquiescence, it does undermine the notion that those ratifying the constitution objected to federal jurisdiction over the states in such cases.

of the Bankruptcy Code states that, "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to . . . [section] 523." 11 U.S.C. § 106(a)(1). Subsection (a)(2) then sets forth the degree to which sovereign immunity is abrogated for actions involving § 523: "The court may hear and determine any issue arising with respect to the application of such sections to governmental units." 11 U.S.C. § 106(a)(2). This is "a clear legislative statement." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786 (1991).

Second, and more difficult, is the question whether Congress's attempt to abrogate state sovereign immunity was pursuant to sufficient authority. The statute at issue here was adopted pursuant to Congress's power under Article I, section 8 of the Constitution "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."[1] If Congress cannot abrogate sovereign immunity under this provision, the statute is invalid and Hood's suit is barred. The Supreme Court has instructed that, when determining whether Congress may abrogate state sovereign immunity, courts are to look at the original structure of the Constitution. *See Alden*, 527 U.S. at 713 ("[I]mmunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the

---

[1]Hood does not argue that the statute was passed under § 5 of the Fourteenth Amendment, which the Supreme Court has recognized provides an adequate basis for abrogation of state sovereign immunity. *See Seminole Tribe*, 517 U.S. at 59. Section 5 authorizes only appropriate legislation designed to remedy violations of the Fourteenth Amendment's substantive provisions, and there must be "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Courts that have addressed this issue agree that the Bankruptcy Code was not designed to remedy violations of the Fourteenth Amendment. *See, e.g.*, *Sacred Heart Hosp. of Norristown v. Pennsylvania* (*In re Sacred Heart Hosp. of Norristown*), 133 F.3d 237, 243-44 (3d Cir. 1998).

Convention or certain constitutional amendments."). The Eleventh Amendment will neither undermine nor bolster any conclusion regarding the purposes of the Convention, because that amendment sought only to restore, not change, the structure established at the Convention that was apparently distorted by the Supreme Court's decision in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793). *Alden*, 527 U.S. at 722-23.

## 2. The Constitution's Text

Beginning with the Constitution's text, Article I gives Congress the power to make "uniform" laws over only two issues: bankruptcy and naturalization.[2] Granting the federal government the power to make uniform laws is, at least to some extent, inconsistent with states retaining the power to make laws over that issue. The Supreme Court noted the importance of the uniformity provision early on:

---

[2]In arguing that the Bankruptcy Clause power is no different from other Article I powers, the State urges us to follow Justice Marshall's dissent in *Hoffman v. Connecticut Dep't of Income Maint.*, 492 U.S. 96, 106 (Marshall, J., dissenting), in which Justice Marshall wrote, "I see no reason to treat Congress' power under the Bankruptcy Clause any differently [than the power under the Commerce Clause], for both constitutional provisions give Congress plenary power over national economic activity." *Id.* at 111. The Fourth Circuit interpreted this to mean that when the Supreme Court in *Seminole Tribe* ruled that Congress could not use the Commerce Clause power to abrogate state sovereign immunity, it necessarily indicated that the Bankruptcy Clause power was similarly weak. *See In re Creative Goldsmiths of Washington, D.C.*, 119 F.3d at 1145-46. However, even if Justice Marshall's dissent were binding, his statement cannot bear the weight the Fourth Circuit puts on it. In that passage of *Hoffman*, Justice Marshall was discussing whether, given that the jurisprudence of the time recognized Congress's power to abrogate sovereign immunity under the Commerce Clause, Congress had a similar power under the then-current version of the Bankruptcy Clause. Justice Marshall concluded that there was no reason to think that the Bankruptcy Clause gave Congress *less* power. *See Hoffman*, 492 U.S. at 111. He had no reason to consider whether it gave Congress *more* power. We thus find nothing in the *Hoffman* dissent that would overcome the textual distinction that the Framers created for the uniform powers.

---

*The Federalist* suggests that the states shed their immunity from suit along with their power to legislate together when the states agreed to the Bankruptcy Clause's uniformity provision. Two passages are relevant. In *The Federalist No. 81*, Hamilton discussed sovereign immunity as follows.

> It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual *without its consent*. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states, and the danger intimated must be merely ideal. The circumstances which are necessary to produce an alienation of state sovereignty, were discussed in considering the article of taxation, and need not be repeated here.

*The Federalist No. 81*, at 422 (Alexander Hamilton). The article on taxation, to which Hamilton refers as identifying the circumstances in which states can be said to "alienat[e]" their sovereignty, is *The Federalist No. 32*.

> [A]s the plan of the convention aims only at a partial union or consolidation, the state governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, *exclusively* delegated to the United States. This exclusive delegation, or rather this alienation of state sovereignty, would only exist in three cases: where the constitution in express terms granted an exclusive authority to the union; where it granted, in one instance, an authority to the union, and in another, prohibited the states from exercising the like authority; and where it granted an authority to the union, to which a similar authority in the states would be absolutely and totally *contradictory* and *repugnant*.

*The Federalist No. 32*, at 155 (Alexander Hamilton). Hamilton specifically offered naturalization as an example of

the Convention than on the necessity of having *some* system in place when Congress could not enact bankruptcy legislation. After recounting the concerns over renegade state laws that led to the exclusivity and uniformity clause, Joseph Story noted that *Sturges*'s non-exclusivity interpretation was by 1833

> firmly established by judicial decisions. As this doctrine seems now to have obtained a general acquiescence, it does not seem necessary to review the reasoning, on which the different opinions are founded; although, as a new question, it is probably as much open to controversy, as any one, which has ever given rise to judicial argumentation. But upon all such subjects it seems desirable to adopt the sound practical maxim, *Interest reipublicae, ut finis sit litium*.

Story, *Commentaries*, at § 1109. Thus the later interpretations of the uniformity provision as not creating exclusive power in the federal government reflect administrative necessity rather than an understanding contrary to that expressed in *The Federalist No. 32*. As Hamilton, Story, and the other early interpreters make clear, the uniformity provision was intended to grant exclusive power to the federal government.

## 4. The States' Ceding of Sovereign Immunity

Of course, it is possible that in ceding some sovereignty with the Bankruptcy Clause, the states ceded their legislative powers but not their immunity from suit. As the *amici* states point out, early Supreme Court decisions that limited states' powers to legislate did not receive the same hostile reception that the Court's decision in *Chisholm v. Georgia*, 2 U.S. (Dall. 419) (1793), which undermined state sovereign immunity, received. This could suggest that the power to legislate and the immunity from suit were distinct aspects of sovereignty in the early Americans' minds, and that the decision to cede one aspect to the federal government does not by itself imply a surrender of the other.

> The peculiar terms of the grant certainly deserve notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to establish uniform laws on the subject throughout the United States. This establishment of uniformity is, perhaps, incompatible with state legislation, on that part of the subject to which the acts of congress may extend.

*Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 193-94 (1819).

It is worth discussing what the uniformity provision is not. The "uniformity" provision is not, as the Fifth Circuit suggests in *In re Fernandez*, "'a requirement of geographic uniformity' and nothing more." *In re Fernandez*, 123 F.3d at 244 (quoting *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172 (1946) (Frankfurter, J., concurring)). As an initial matter, this language from Justice Frankfurter's concurring opinion in *Vanston* was inconsistent with the majority opinion in that case. Justice Frankfurter reasoned in *Vanston* that the creditors' claim was invalid under state law, so there was nothing for the bankruptcy court to enforce; as long Congress treated all claims created under state law uniformly, regardless of the state, the uniformity requirement had been satisfied. *See Vanston*, 329 U.S. at 172-73 (Frankfurter, J., concurring). However, the majority in *Vanston* found no reason to inquire whether state law had created any valid claim, because the asserted claim was inconsistent with federal bankruptcy policies and thus could not be asserted — regardless of its status under state law. *See Vanston*, 329 U.S. at 163-64. On the majority's reasoning, federal courts must do more than treat state laws uniformly; federal courts must enforce federal bankruptcy law. If *Vanston* is any guide as to what uniformity requires, then uniformity requires much more than Justice Frankfurter's concurrence suggests.

Nor, as the following discussion demonstrates, does Article I, section 8 reflect a mere congressional policy favoring uniformity across state borders. Unlike *Florida*

*Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627 (1999), in which the Supreme Court found that a legislative preference for uniformity could not override a constitutional prohibition on the abrogation of state sovereign immunity, *id.* at 645, this case involves the question whether a constitutional uniformity requirement itself authorizes Congress to abrogate state sovereign immunity.

### 3. The Framers' Understanding of the Bankruptcy Power

As it was initially understood, the Bankruptcy Clause represented the states' total grant of their power to legislate on bankruptcy. In order for laws to be uniform, the laws must be the same everywhere. That uniformity would be unattainable if states could pass their own laws. Alexander Hamilton stated that the federal government had "exclusive jurisdiction" where the Constitution granted Congress the power to make uniform laws. "This must necessarily be exclusive; because if each State had power to prescribe a DISTINCT RULE, there could be no UNIFORM RULE." *The Federalist No. 32*, at 155 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001). The earliest cases similarly interpreted the grant of power as exclusive, noting that laws could be uniform only if a single agent were issuing them. Associate Justice Bushrod Washington, sitting as Circuit Justice, reasoned this way in *Golden v. Prince*, 10 F. Cas. 542 (C.C.D. Pa. 1814), writing, "That the exercise of the power to pass bankrupt and naturalization laws by the state governments, is incompatible with the grant of a power to congress to pass uniform laws on the same subjects, is obvious, from the consideration that the former would be dissimilar and frequently contradictory; whereas the systems are directed to be uniform, which can only be rendered so by the exclusive power in one body to form them." *Id.* at 545.

The authority was understood to be exclusive because any lesser grant would have defeated the grant's original purpose. The bankruptcy system before 1789 was marked by chaos.

Because each state had different laws, the discharge of a Pennsylvanian's debts might have no effect on his debts in Maryland, and the interests of out-of-state creditors could be subordinated to in-state creditors. This system was not only ineffective, in that it did not allow debtors the fresh start that bankruptcy policies seek, but also ripe for manipulation, in that it would give the Pennsylvania creditor an incentive to assign his interest in the debtor's estate to someone in Maryland, making the debtor no better off after bankruptcy than before. However, the justification for the grant of exclusivity was not a mere desire to have *one* system, but a system that rose above individual states' interests. As Joseph Story noted, there were fears that each state would frame a bankruptcy system that "best suits its own local interests, and pursuits" or that was marked "by undue domestic preferences and favours." 3 Joseph Story, *Commentaries on the Constitution* §§ 1102, 1104 (1833), *in The Founders' Constitution* (Philip B. Kurland & Ralph Lerner eds., 1987). Indeed, setting bankruptcy policies on the state level would enable states to favor in-state creditors over similarly-situated out-of-state creditors. By granting the power to Congress exclusively, the Constitution prevented runaway states from defeating bankruptcy's goals.

Although this understanding that the federal power was exclusive eventually gave way to an acceptance that states could, in the absence of federal legislation, pass laws on bankruptcy, this development in no way undermines the understanding at the time of the Convention that the grant was exclusive. Congress did not pass its first bankruptcy act until 1800, repealed it in 1803, and was unable to enact further legislation until 1841. *See* David A. Skeel, Jr., *Debt's Dominion: A History of Bankruptcy Law in America* 25 (2001). In the absence of a federal bankruptcy code, states were forced to rely on their own structures, and in 1819 the Supreme Court in *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122 (1819), ruled that the Bankruptcy Clause prohibited states from acting only where Congress had already acted. *Id.* at 193-96. However, the *Sturges* non-exclusivity interpretation was based less on the original understanding of