In re Pedro J. FLORES, Debtor.

Pedro J. Flores, Plaintiff,

v.

Illinois Department of Public Health, Defendant.

Bankruptcy No. 02–11258.
Adversary No. 02–1066.

United States Bankruptcy Court, D. Vermont.

Nov. 5, 2003.

Todd Taylor, Burlington, VT, for Debtor–Plaintiff.

Val C. Simhauser, Assistant Attorney General, Springfield, IL, for Defendant.

## MEMORANDUM OF DECISION

COLLEEN A. BROWN, Bankruptcy Judge.

### DENYING DEFENDANT'S MOTION TO DISMISS

On December 7, 2002, Debtor–Plaintiff Pedro J. Flores (hereinafter, "the Debtor") filed a Complaint seeking a determination of the dischargeability of a scholarship obligation pursuant to 11 U.S.C. § 523(a)(8) [1] (doc. # 1). In response, Defendant Illinois Department of Public Health (hereinafter, "the State"), the holder of the obligation, filed a Motion to Dismiss (doc. # 9) alleging it was not subject to this Court's jurisdiction because of its 11th Amendment sovereign immunity. The Debtor opposed the State's Motion to Dismiss, urging the Court to adopt the rationale of *Hood v.*

---

1. All statutory references herein refer to Title 11 of the United States Code ("the Bankruptcy Code") unless otherwise indicated.

*Tennessee Student Assistance Corp. (In re Hood)*, 319 F.3d 755 (6th Cir.2003).

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 1334. For the reasons stated below, the State's Motion to Dismiss is denied.

## I. THE ISSUE PRESENTED

The issue presented is whether the State's sovereign immunity protects it from having to defend an action that seeks a determination of the dischargeability of the scholarship obligation the Debtor owes to it before this Court.

## II. BACKGROUND

On September 10, 2002, the Debtor and his wife filed for chapter 7 bankruptcy relief. The largest debt obligation listed in their schedules was the $340,000 obligation owed to the State. The State did not file a proof of claim.

On December 7, 2002, the Debtor initiated the instant adversary proceeding to determine the dischargeability of the scholarship obligation (hereinafter "the subject debt"). The State did not file an answer; instead, it asserted the defense of sovereign immunity in a Motion to Dismiss. *See* doc. # 9. Relying upon *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), and *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), the State argues it is entitled to sovereign immunity under the United States Constitution, as well as under the Tenth and Eleventh Amendments thereto. The State contends that while § 8 of Article I of the Constitution empowers Congress to establish uniform bankruptcy laws, it does not authorize Congress to abrogate states' sovereign immunity; and therefore, the State argues § 106(a) of the Bankruptcy Code is

an unconstitutional exercise of Congressional power. The Debtor opposes the State's Motion to Dismiss asserting that, under the rationale of *Hood*, the abrogation of sovereign immunity articulated in § 106(a) of the Bankruptcy Code is consistent with the Constitution and therefore, this Court can properly adjudicate the issue raised in this adversary proceeding against the State.

## III. DISCUSSION

### A. The Seminole Tribe Test for Analyzing Abrogation of States' Sovereign Immunity

In *Seminole Tribe*,[2] the Supreme Court articulated a two-part inquiry for determining whether an abrogation of states' sovereign immunity by Congress is proper. *See Seminole Tribe*, 517 U.S. at 56–58, 116 S.Ct. 1114. In order to be a sustainable abrogation, Congress must first, clearly articulate its intention to abrogate states' sovereign immunity from suit, *see id.* at 56, 116 S.Ct. 1114, and second, effect the abrogation within the bounds of its constitutionally granted powers, *see id.* at 58, 116 S.Ct. 1114. In outlining the second prong of this test, the Supreme Court stated that Congress' attempt to abrogate states' sovereign immunity through Article I, § 8 of the Constitution exceeded constitutional bounds, *see id.* at 65–66, 116 S.Ct. 1114. Subsequently, in *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), the Supreme Court extended its *Seminole Tribe* two-part abrogation analysis to suits in state courts.

Article I, § 8 of our Constitution bestows upon Congress eighteen specific powers. *See* U.S. CONST. art. I, § 8, cls. 1–18. Clause 3, colloquially known as the "Indian Commerce Clause," granted Congress the

---

**2.** The Seminole Tribe sought enforcement of the Indian Gaming Regulatory Act, which was passed pursuant to the Indian Commerce Clause, U.S. CONST. art. I, § 8, cl. 3.

power "To regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes." *See id.* at cl. 3. Conversely, Clause 4, known as the "Bankruptcy Clause," granted Congress the power "To establish an uniform Rule of Naturalization, and *uniform* Laws on the subject of Bankruptcies *throughout* the United States." *See id.* at cl. 4 (emphasis added). Given the plain language of Clause 3, including the lack of an uniformity requirement in the Indian Commerce Clause, it is not surprising that the Supreme Court held that this Clause did not empower Congress to abrogate states' sovereign immunity. *See Seminole Tribe,* 517 U.S. at 62, 116 S.Ct. 1114. However, the Bankruptcy Clause does contain a uniformity clause, and this is a critical distinction.

 In its attempt to delineate the bounds of Congress' powers, the Supreme Court may have painted its picture of sovereign immunity in the *Seminole Tribe* case with an overly broad brush. A careful analysis of Article I, and *The Federalist* papers, that have been relied upon extensively to interpret the intentions of the Framers of the Constitution,[3] persuades this Court that a finer brush is needed to circumscribe Congress' powers. This Court finds the Sixth Circuit has used just such a brush in its meticulously researched, well-reasoned, and very persuasive decision in *Hood v. Tennessee Student Assistance Corp. (In re Hood),* 319 F.3d 755 (6th Cir.2003). This Court adopts the *Hood* court's analysis as to the proper scope of sovereign immunity abrogation in the context of bankruptcy, and its conclusion that the State may not avoid dischargeability proceedings by donning the cloak of a sovereign entity.

### B. The Hood *Analysis of the* Seminole Tribe Case *as Applied to* Bankruptcy

In *Hood,* the debtor initiated an adversary proceeding against the governmental body Tennessee Student Assistance Corporation ("TSAC") to determine whether she was entitled to discharge her student loans, pursuant to § 523(a)(8). *See Hood,* 319 F.3d at 758. TSAC moved to dismiss the complaint on the basis of its sovereign immunity. *See id.* The bankruptcy court denied TSAC's motion, "holding that Congress acted pursuant to a valid grant of constitutional authority when it abrogated the states' sovereign immunity under 11 U.S.C. § 106(a)." *Id.* TSAC appealed and the Bankruptcy Appellate Panel ("BAP") affirmed. The BAP scrutinized the 18 clauses of Article I and distinguished the Bankruptcy Clause from the other 17 clauses because of the directive in that clause that Congress was to establish "uniform Laws." U.S. CONST. art. I, § 8, cl. 4. Relying on *The Federalist No. 32,* the BAP concluded that this was not a distinction of happenstance; rather, the empowerment of Congress to establish "uniform Laws" "required states to surrender their own power to make such laws and thus an important degree of their sovereignty." *Id.* at 759. Therefore, the BAP held that Congress did not exceed the limits of its power when it abrogated states' sovereign immunity under § 106(a); rather, the *Seminole Tribe* two-part inquiry was satisfied. *See id.* TSAC appealed the BAP decision and the Sixth Circuit also affirmed. *See id.* at 768.

A unanimous Bankruptcy Appellate Panel affirmed and ruled that "as a part of the plan of the Constitutional Convention, the States ceded to Congress their

---

**3.** *See, e.g., Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997);

*Seminole Tribe,* 517 U.S. at 54, 69, 70 n. 13, 116 S.Ct. 1114

sovereignty over bankruptcy discharge matters." Although the [bankruptcy] panel acknowledged that *Seminole Tribe* ... could be interpreted as precluding Congress from ever abrogating states' sovereign immunity under any of its Article I powers, the [bankruptcy] panel interpreted *The Federalist No. 81* and *No. 32* to distinguish bankruptcy, along with naturalization, from the rest of the Article I power.

*Id.* at 758–59 (internal citations to BAP opinion omitted).

While acknowledging that five circuit courts[4] had concluded under *Seminole Tribe* that Congress, relying upon its Bankruptcy Clause powers, could not validly abrogate states' sovereign immunity, the Sixth Circuit resisted jumping to this conclusion. Instead, it critically examined *Seminole Tribe's* broad language barring Congress from abrogating states' sovereign immunity pursuant to all of its Article I powers. *See id.* at 761. The Sixth Circuit reframed the issue of sovereign immunity in the context of bankruptcy as "whether a constitutional *uniformity requirement* itself authorized Congress to abrogate state sovereign immunity." *Id.* at 764 (emphasis added). Fine-tuning the

*Seminole Tribe* inquiry, the Sixth Circuit focused specifically on the Bankruptcy Clause of § 8 of Article I, rather than on Article I in general, and concluded "that the text of the Constitution and other evidence of the Framers' intent demonstrate that under the Bankruptcy Clause of Article I, section 8, Congress has the power to abrogate state sovereign immunity" in order to ensure uniformity in the bankruptcy system. *Id.* at 762.

There is little disagreement that § 106(a) of the Bankruptcy Code clearly articulates Congress' intention to abrogate state sovereign immunity. Section 106(a) reads, in pertinent part:

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections ... 523 ... of this title.

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections of the Federal Rules of Bankruptcy Proce-

---

4. Unlike the mechanical application of *Seminole Tribe* employed by the Third, Fourth, Fifth, Seventh and Ninth Circuits, *see, e.g., In re Sacred Heart Hosp. of Norristown,* 133 F.3d 237 (3rd Cir.1998) (holding that § 106(a) fails the second prong of the *Seminole Tribe* test and that Congress exceeded its powers because the affirmative requirement for uniformity is not enough to distinguish the Bankruptcy Clause from Congress' other Article I powers); *In re Creative Goldsmiths of Washington, D.C.,* 119 F.3d 1140 (4th Cir.1997) (relying on *Seminole Tribe's* restrictive interpretation of Congress' Article I powers in holding that Congress does not have authority under the Bankruptcy Clause, an Article I power, to abrogate state sovereign immunity in federal courts); *In re Fernandez,* 123 F.3d 241 (5th Cir.1997) ("We find no principled

reason to distinguish in a relevant way Congress' Commerce Clause power that it purported to exercise in *Seminole Tribe* from its power under the Bankruptcy Clause for the purposes of state sovereign immunity."); *Nelson v. La Crosse County Dist. Atty. (State of Wisconsin),* 301 F.3d 820 (7th Cir.2002) ("Based on the Supreme Court's decision in *Seminole Tribe* and its progeny, as well as the decisions of our sister circuits, we conclude that Congress did not validly abrogate state sovereign immunity when enacting Section 106(a) pursuant to it Article I legislative power."); *In re Mitchell,* 209 F.3d 1111 (9th Cir. 2000) (applying *Seminole Tribe's* two-pronged inquiry, holding § 106(a) was not an appropriate exercise of Congress' enforcement powers), the Sixth Circuit focused specifically on the language of the Bankruptcy Clause.

dure, including an order or judgment awarding a money recovery, but not including an award of punitive damages...

Determining whether this abrogation of states' sovereign immunity by Congress was effected within the scope of its constitutional powers, *i.e.,* applying the second prong of the *Seminole Tribe* test, is a more controversial undertaking. As the Sixth Circuit's opinion implies, *Seminole Tribe* made a sweeping proclamation that *any* abrogation pursuant to Congress' Article I, § 8 powers was unconstitutional. Yet, the Supreme Court has instructed in a subsequent sovereign immunity case, *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), "that, when determining whether Congress may abrogate state sovereign immunity, courts are to look at the original structure of the Constitution." *Hood,* 319 F.3d at 762. There, the Supreme court instructed, "[I]mmunity from suit is a fundamental aspect of the sovereignty which the State enjoyed before the ratification of the Constitution, and which they retain today ... *except as altered by the plan of the Convention or certain constitutional amendments." Alden,* 527 U.S. at 713, 119 S.Ct. 2240 (emphasis added). Taking that directive to heart, the Sixth Circuit proceeded to scrupulously analyze the Convention plan regarding the Bankruptcy Clause.

The Sixth Circuit began its inquiry with the text of the Bankruptcy Clause itself, keeping its focus on the constitutional requirement for *uniform* laws. *See id.* at 763. It reasoned that "[g]ranting the federal government the power to make uniform laws is, at least to some extent, inconsistent with states retaining the power to make laws over that issue." *Id.* The Sixth Circuit buttressed its reasoning with

an early Supreme Court case, *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 193–94, 4 L.Ed. 529 (1819). In *Sturges,* Chief Justice John Marshall observed:

> The peculiar terms of the grant certainly deserve notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to establish uniform laws on the subject throughout the United States. This establishment of uniformity is, perhaps, incompatible with state legislation, on that part of the subject to which the acts of congress [sic] may extend.

*Hood,* 319 F.3d at 763 (quoting *Sturges*).

The Sixth Circuit then turned to the Framers' understanding of the Bankruptcy Clause: "As it was initially understood, the Bankruptcy Clause represented the states' total grant of their power to legislate on bankruptcy." *Id.* at 764. The Court found ample support for this conclusion in Alexander Hamilton's writings. In *The Federalist No. 32,* Hamilton "stated that the federal government had 'exclusive jurisdiction' where the Constitution granted Congress the power to make uniform laws." *Id.* Moreover, the Sixth Circuit posits that, "*The Federalist* suggests that the states shed their immunity from suit along with their power to legislate together when the states agreed to the Bankruptcy Clause's uniformity provision," *Id.* at 765, by ratifying the Constitution. In analyzing both *The Federalist No. 32* and *No. 81,* the Sixth Circuit concluded that in the minds of the Framers, ceding sovereignty implied ceding sovereign immunity, as well. *See id.* at 766. "Thus, *The Federalist No. 81* and *No. 32* suggest that the states ceded their immunity by granting Congress the power to make uniform laws." *Id.*[5]

---

**5.** The Sixth Circuit is not the first court to articulate the importance that uniformity

played in granting Congress the power to establish bankruptcy laws. Early on, courts

In its thoroughness, the Sixth Circuit also examined the ratification debates on the Constitution. *See id.* at 766–67. Apparently, participants in the debates were "meticulous in raising their objections clause-by-clause, but none of the debaters objected to subjecting the states to federal suits in bankruptcy." *Id.* at 767. Acknowledging this absence could be "a gap in an otherwise careful debate," the Sixth Circuit opines that, "it could also reflect the ratifiers' acceptance that because a federal bankruptcy system could cure the previous systems' ills only if it applied uniformly to all creditors and debtors, the Bankruptcy Clause must grant Congress the power to abrogate the states' sovereign immunity." *Id.*

The Sixth Circuit concluded that the Bankruptcy Clause did imbue Congress with the authority to abrogate states' sovereign immunity. Hence, when Congress enacted § 106(a), it did so within constitutional bounds. The Sixth Circuit also observed that there are at least two good reasons to distinguish bankruptcy proceed-

ings from other litigation brought against a state:

> Unlike a traditional lawsuit, in which a state is forced to defend itself against an accusation of wrongdoing, the bankruptcy process 'is shortly speaking, an adjudication of interests claimed in a *res.*' *Gardner,* 329 U.S. at 574, 67 S.Ct. 467. If the state wishes to assert its interest in the *res,* it may do so. If it prefers not to, it may decline, and the debtor will still need to convince the bankruptcy court that repayment will constitute an 'undue hardship.'

*Id.* at 768 (citing § 523(a)).

### C. The Flawed Reliance of the Other Circuit Courts

It is also important to note, as has the Sixth Circuit, legal scholars and judges,[6] that the circuit court majority may have reached their conclusions by improperly relying upon and/or misconstruing a sentence from a Justice Marshall dissenting opinion,[7] as well as a sentence from a Justice Frankfurter concurring opinion[8] to bolster their analysis of the Bankruptcy

---

understood the necessity and importance of this uniformity:

> That the exercise of the power to pass bankrupt and naturalization laws by the state governments, is incompatible with the grant of a power to congress [sic] to pass uniform laws on the same subjects, is obvious, from the consideration that the former would be dissimilar and frequently contradictory; whereas the systems are directed to be uniform, which can only be rendered so by the exclusive power in one body to form them.

*Golden v. Prince,* 10 F. Cas. 542, 545 (C.C.D.Pa.1814) (cited in *Hood,* 319 F.3d at 764).

**6.** *See* Hon. Randolph J. Haines, *The Uniformity Power: Why Bankruptcy is Different,* 77 Am. Bankr. L.J. 129 (Winter 2003); Leonard H. Gerson, *A Bankruptcy Exception to Eleventh Amendment: Limiting the* Seminole Tribe *Doctrine,* 74 Am. Bankr. L.J. 1 (Winter 2000).

**7.** *Hoffman v. Connecticut Dep't of Income Maintenance,* 492 U.S. 96, 106–11, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989) (Marshall, J., dissenting) ("I see no reason to treat Congress' power under the Bankruptcy Clause any differently, for both constitutional provisions [*i.e.,* the Commerce Clause and the Bankruptcy Clause] give Congress plenary power over national economic activity.").

**8.** *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 172, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (Frankfurter, J., concurring) ("The Constitutional requirement of uniformity is a requirement of geographic uniformity. It is wholly satisfied when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country regardless of the State in which the bankruptcy court sits.").

.

Clause in the context of *Seminole Tribe* and its progeny.

### 1. *Justice Marshall's Dissent in Hoffman*

In *Hoffman v. Connecticut Dep't of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), the Supreme Court declared that § 106(c) of the Bankruptcy Code did not abrogate the 11th Amendment immunity of the states. In making this holding, it also made clear that it was not addressing whether Congress had the *authority* under its bankruptcy power to abrogate immunity. *See id.* at 104, 109 S.Ct. 2818. Justice Marshall, believing Congress had the authority under the Bankruptcy Clause to abrogate the states' 11th Amendment sovereign immunity, dissented. *See id.* at 106–11, 109 S.Ct. 2818. He stated: "I see no reason to treat Congress' power under the Bankruptcy Clause any differently, for both constitutional provisions [*i.e.,* the Commerce Clause and the Bankruptcy Clause] give Congress plenary power over national economic activity." *Id.* at 111, 109 S.Ct. 2818. It is critical to observe that when he wrote this statement, Justice Marshall did not need to interpret the Constitution's uniformity requirement in the Bankruptcy Clause. At the time *Hoffman* was decided, the Supreme Court case of *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), held Congress was able to abrogate 11th Amendment states' sovereign immunity under their Article I powers. *Seminole Tribe* later overruled this holding, *see Seminole Tribe,* 517 U.S. at 65–66, 116 S.Ct. 1114, but knowing that this was the law of land at the time Justice Marshall made the now famous

dissent is essential to placing the comment in the proper context.

The Third, Fourth and Seventh Circuits,[9] holding that Congress did not act pursuant to a valid exercise of power, focused on Justice Marshall's statement that he saw "no reason to treat Congress' power under the Bankruptcy Clause any differently, for both constitutional provisions [*i.e.,* the Commerce Clause and the Bankruptcy Clause] give Congress plenary power over national economic activity." *Hoffman,* 492 U.S. at 111, 109 S.Ct. 2818. However, they failed to acknowledge the heart of Justice Marshall's position, which was:

> By expressly including States within the terms "creditor" and "entity," Congress intended States generally to be treated the same as ordinary "creditors" and "entities," who are subject to money judgments in a relatively small number of Code provisions. The effect of today's decision is to exempt States from these provisions, which are crucial to the efficacy of the Code. The plurality therefore ignores Congress' careful choice of language and turns States into preferred actors.

*Id.* at 109–10, 109 S.Ct. 2818. In essence, Justice Marshall was arguing against states receiving preferential treatment within the context of the Bankruptcy Code. He believed it would be unfair to allow the states to don the cloak of sovereign immunity when they were voluntarily acting as ordinary creditors. Given the entire context of Justice Marshall's dissent, it appears clear that he was persuaded that Congress had the power to abrogate states' sovereign immunity under the Bankruptcy Clause. The Third, Fourth

---

**9.** *In re Sacred Heart Hosp.,* 133 F.3d at 243 (3rd Cir.); *In re Creative Goldsmiths,* 119 F.3d at 1146 (4th Cir.); *Nelson,* 301 F.3d at 832 (7th Cir.). Further, while *In re Mitchell,* 209 F.3d at 1120 (9th Cir.), and *In re Fernandez,* 123 F.3d at 244 (5th Cir.), did not specifically cite Justice Marshall's dissent, they each distinguish the *Hoffman* case.

and Seventh Circuits' holdings appear to distort the image of sovereign immunity in the bankruptcy context painted by Justice Marshall's dissent.

### 2. Justice Frankfurter's Concurrence in Vanston

Similarly, the Third, Fifth and Seventh Circuits [10] rely on one sentence in a concurrence by Justice Frankfurter, which they have taken out of context and, hence, have erroneously declared that his words compel the conclusion that the uniformity requirement of the Bankruptcy Clause requires geographic uniformity only. In his concurrence in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), Justice Frankfurter stated, *inter alia*, "The Constitutional requirement of uniformity is a requirement of geographic uniformity." *Id.* at 172, 67 S.Ct. 237. This Court is troubled by the circuit courts' reliance on Justice Frankfurter's statement taken in isolation. I would respectfully submit it is misplaced reliance since the majority in *Vanston* implicitly rejected the geographic uniformity test:

> In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits. *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, has no such implication. That case decided that a federal district court acquiring jurisdiction because of diversity of citizenship should adjudicate controversies as if it were only another state court. *But bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to deter-*

*mine how and what claims shall be allowed under equitable principles.*

*Id.* at 162–63, 67 S.Ct. 237 (1946) (emphasis added); *see also* Leonard H. Gerson, *A Bankruptcy Exception to Eleventh Amendment: Limiting the Seminole Tribe Doctrine*, 74 AM. BANKR. L.J. 1 (Winter 2000). Rather, as the Sixth Circuit astutely reasoned, it is precisely this constitutionally-mandated uniformity requirement that enables Congress to both legislate bankruptcy laws and abrogate states' sovereign immunity regarding these laws, without regard to state lines or states' rights.

Therefore, it is this Court's conclusion that the *Hood* court's analysis of Congress' power to abrogate sovereign immunity in the bankruptcy context is not only correct, but the only analysis to date by a circuit court that is consistent with the mandates of the Unites States Constitution, *The Federalist* papers, and the abrogation of sovereign immunity jurisprudence by the United States Supreme Court.

### D. Public Policy Considerations.

█ Congress has made clear that the Bankruptcy Code is designed to serve two paramount purposes: to grant each honest debtor a fresh start and to treat all creditors equally. *See* S.Rep. No. 95–989, at 5792–5821 (1978); *see also* H. Rep. No. 95–595, at 5965–5966 (1978). However, if the State's arguments were to prevail here, each of these purposes would be undermined.

First, if we were to adopt the State's position, a debtor's fresh start could be circumscribed by a factor as capricious as whether he or she had the bad luck to take out a student loan that the state held at the time he or she filed for bankruptcy

---

**10.** *In re Sacred Heart Hosp.*, 133 F.3d at 243 (3rd Cir.); *In re Fernandez*, 123 F.3d at 244 (5th Cir.); *Nelson*, 301 F.3d at 834 (7th Cir.).

relief. There can be no uniformity at all in the application of the American bankruptcy laws if the states have the right to act as lenders and when doing so determine the parameters of a debtor's discharge by asserting sovereign immunity. No theory of uniformity in the bankruptcy arena can be sustained if a debtor's right to discharge a student loan, and thus his or her right to a fresh start, can be severely diminished, even if the § 523(a)(8) undue hardship criteria are established, simply because a particular state eventually becomes the holder of the debtor's student loan. This, in essence, gives states the right to determine who gets a fresh start, thereby depriving certain debtors from equal protection of the Bankruptcy Code.

Second, creditors would be put in the unfair position of being subject to the discharge provisions of the Bankruptcy Code, while state lender creditors would not face the same risk of discharge, being exempt from that eventuality by virtue of their sovereign immunity. If a state can effectively deprive a debtor of his or her fresh start by stepping into the shoes of one of the creditors, the uniformity of the fresh start is eviscerated. If the question of whether a student loan obligation is discharged upon a showing of undue hardship is decided by reference to whether the creditor is a state entity, then all creditors are not being treated equally in the bankruptcy system. Such an outcome not only violates the intent of the Bankruptcy Code, it is inconsistent with the Bankruptcy Clause of the Constitution requiring uniform bankruptcy laws, U.S. CONST. art. I, § 8, cl. 4, as well as the 14th Amendment of the Constitution, U.S. CONST. amend. XIV, guaranteeing equal protection under the law.

This Court also observes that the role of the State as a type of lender in the instant transaction is not insignificant. Justice Steven, dissenting in *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 691, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), a case focusing on the Patent Remedy Act, wrote:

> The procedural posture of this case requires the Court to assume that Florida Prepaid [*i.e.*, the entity] is an "arm of the State" of Florida because its activities relate to the States' educational programs. But the validity of that assumption is doubtful if the Court's jurisprudence in this area is to be based primarily on present-day assumptions about the status of the doctrine of sovereign immunity in the 18th century. Sovereigns did not then play the kind of role in the commercial marketplace that they do today. In future cases, *it may therefore be appropriate to limit the coverage of state sovereign immunity by treating the commercial enterprises of the States like the commercial activities of foreign sovereigns under the Foreign Sovereign Immunities Act of 1976.*

*Id.* at 691, 119 S.Ct. 2219 (emphasis added). The *Florida Prepaid* majority repudiated the use of the "market participant" exception in the context of states' sovereign immunity and bankruptcy, ruling:

> The "market participant" exception to judicially created dormant Commerce Clause restrictions makes sense because the evil addressed by those restrictions—the prospect that States will use custom duties, exclusionary trade regulations, and other exercises of governmental power (as opposed to the expenditure of state resources) to favor their own citizens—is entirely absent where the States are buying and selling in the market. *In contrast, a suit by an individual against an unconsenting State is the very evil at which the Eleventh Amendment is directed—and it exists whether or not the State is acting for*

*profit, in a traditionally "private" enterprise, as a "market participant."*

*Id.* at 687, 119 S.Ct. 2219 (emphasis added). However, the *Florida Prepaid* court was not examining the Bankruptcy Code or the implications of state sovereign immunity in bankruptcy proceedings. There is no overriding prohibition in the Constitution or in sovereign immunity principles which prohibits a state from engaging in marketplace activities. Moreover, when a state engages in such conduct, the consequences must be examined with a different lens than is used when it is acting as the regulator of the market.

In developing the market participant exemption and how it could and should be applied in the context of the Bankruptcy Code, Justice Stevens' observations in his dissenting opinion in *Florida Prepaid* is crucial. Moreover, his partial dissent and partial concurrence a year later in *Kimel v. Florida Board of Regents,* 528 U.S. 62, 92–109, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), an Age Discrimination in Employment Act case,[11] provides further insight into his perspective on the issue. In *Kimel,* Justice Stevens noted:

Congress' power to regulate the American economy includes the power to regulate both the public and private sectors of the labor market. Federal rules outlawing discrimination in the workplace, like the regulation of wages and hours or health and safety standards, may be enforced against public as well as private employers. *In my opinion, Congress' power to authorize federal remedies against state agencies that violate federal statutory obligations is coextensive with its power to impose those obligations on the States in the first place.*

Neither the Eleventh Amendment nor the doctrine of sovereign immunity places any limit on that power. It is the Framers' compromise giving each State equal representation in the Senate that provides the principal structural protection from the sovereignty of the several States. Thus, Congress can use its broad range of flexible tools to approach the delicate issue of how to balance local and national interests in the most responsive and careful manner. Federalism concerns do make it appropriate for Congress to speak clearly when it regulates state action. But when it does so, as it has in these cases, *we can safely presume that the burdens the statute imposes on the sovereignty of the several States were taken into account during the deliberative process leading to the enactment of the measure.*

*Id.* at 92–93, 120 S.Ct. 631 (emphasis added) (citations omitted). Justice Stevens' dissenting statements in *Florida Prepaid* and *Kimel* motivate this Court to consider the market participant exemption as a valid remedy to the situation herein. Abrogating states' sovereign immunity when the state is acting as a market participant is necessary for the integrity of the bankruptcy system and the states' sovereign immunity as well.

## IV. CONCLUSION

The Court finds Congress clearly articulated its intent to abrogate states' sovereign immunity in 11 U.S.C. 106(a). Further, relying on the thorough, sound and compelling rationale of *Hood v. Tennessee Student Assistance Corp. (In re Hood),* 319 F.3d 755 (6th Cir.2003), this Court finds Congress' abrogation of the State's

**11.** In *Kimel,* Justice Stevens was joined by Justices Souter, Ginsburg and Breyer. Conversely, in *Florida Prepaid,* Justice Stevens authored his own dissent; no other Justices joined it. Rather, Justice Breyer also wrote a dissent in *Florida Prepaid,* in which Justices Stevens, Souter and Ginsburg joined.

sovereign immunity was effected within its constitutionally granted powers under the Bankruptcy Clause of the Constitution. U.S. CONST. art I, § 8, cl. 4. Therefore, the claim of sovereign immunity by the Defendant, Illinois Department of Public Health State, is ineffective in this litigation. The Defendant's Motion to Dismiss is denied.

This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law.